*E. L. Twing* and *W. B. Wheeler*, for the state.

---

## UNDESIGNATED INVESTMENTS BY TRUSTEES.

[Circuit Court of Huron County.]

ANNA C. BROWN v. THEODORE WILLIAMS ET AL.

Decided, 1906.

*Trusts and Trustees—Investment of Trust Funds—Duty of Trustee to Distinctly Designate—Election of Cestuis Que Trustent—Rights of Remaindermen.*

1. Where a change in the investment of a trust fund has been made by the trustee without any specific designation of the new investment at the time of the change as that of the trust fund, but leaving it open so as to make it possible for him to claim it as his own should it be profitable, or treat it as the trust should it prove disastrous, the *cestuis que trustent* can elect whether they will consider the investment as made of the trust fund, or require the trustee to account for the trust and a reasonable income from it.

2. Where the income of a trust fund is bequeathed to a legatee, her share at her death to go to her surviving children, such children are not after the death of the mother bound by any election or ratification of changes in the investment of the trust fund which prove injurious to them.

PARKER, J.; HAYNES, J., and WILDMAN, J., concur.

Appeal from Huron Common Pleas Court.

This case is in this court by appeal. It appears from the pleadings and the evidence that in 1869 James Williams, a farmer residing in this county, died testate, leaving surviving him

Julia B. Jackson, Louise Bronson, Caroline Williams, James B. Williams and the defendant, Theodore Williams, his children. His last will and testament was duly admitted to probate and Theodore Williams and James B. Williams, nominated therein, were duly appointed as executors of the last will and testament and they qualified and acted as such jointly until the time of the death of James B. Williams, which occured in 1878. The will bequeathed to the sons, Theodore and James B., all the stock of the testator in the Toledo Bridge Company, amounting to $11,000, par value; but upon his stock was imposed by the will a trust in favor of the other children, and upon their decease, their surviving children. That is, it was provided that the income from this stock or from any other investment made from the proceeds of the stock, should go to them, but the body of the fund should belong to James B. and Theodore. One-half of this income was to go to Julia B. Jackson and, at her demise, her share of the income was to go to her surviving children. She died in 1896, leaving the plaintiff, Anna C. Brown, and the defendants, Theodore W. Jackson and Florence B. Friend, her only surviving children.

There is some controversy arising upon the construction of this devise or this bequest as to whether, upon the death of Julia B. Jackson, all of the income which she had theretofore been entitled to, then went to these parties, she having had other children that died before her decease. But we are of the opinion that it is very clear from the will that these three surviving children took the same interest in the income from the fund as had theretofore been enjoyed by their mother. It seems that this stock in the Toledo Bridge Company at the time of the decease of the testator was regarded as very valuable and was paying good dividends and it continued to pay good dividends for some years thereafter. But in 1872, it became advisable and perhaps necessary to dispose of the bridge stock and to take in exchange for it a bridge bond of the city of Toledo, and that was done. The amount received in exchange was $7,000 in the bridge bond and $333.33 in cash. Afterwards, in November of 1882, these bridge-bonds were redeemed by the city. Up to that

time the income from the bridge bonds had been 8 per cent. per annum or 4 per cent. each period of six months, interest being paid semi-annually

Mr. Williams in his account gave credit to the sister for 8 per cent. upon $333.33 of cash. Early in 1882 Theodore Williams, the surviving executor and trustee, became the owner of bonds of the Norwalk Gas Light Company. He made purchases of these bonds at different periods until he became the owner of the full issue of $25,000. These bonds provided for the payment of interest at the rate of 6 per cent. per annum, or 3 per cent. semi-annually. Default was made in the payment of interest upon these bonds in March, 1891.

It appears that the property had become very much run down and upon default being made, Mr. Williams, as trustee, under a mortgage securing the bonds, foreclosed, and the property was sold, and it turned out that it paid a very small percentage upon the bonds. In fact, the bonds by that time had become almost worthless. It appears that at the time Mr. Williams became the owner of the bonds, they were regarded in the market as good securities, and as being fairly worth anywhere from eighty to ninety cents upon the dollar.

Upon the gas light company making default in payment of interest upon these bonds, or very soon thereafter, Mr. Williams ceased paying Julia B. Jackson anything of the trust fund under the will that has been referred to, claiming, as it appears, that he had invested the money derived from the redemption of the Toledo bonds and the other amount of $333.33, in the Norwalk Gas Light Company bonds, and so far as appears from the evidence Mrs. Julia B. Jackson acquiesced in this statement and settled with her trustee upon this basis; but the plaintiff in this case and the cross-petitioners, Theodore W. Jackson and Florence B. Friend, claim and contend that Mr. Williams did not make this investment of the fund derived from the redemption of the Toledo bonds, or that, if he did, it was not done in such a way as that they are bound by his action, and they thereafter called upon him to account for interest for the time that has expired since their mother's death, and since they became en-

titled to the income from this fund; they called upon him to
account for the interest at least, upon $7,333.33. The contro-
versy here turns upon the question whether Mr. Williams made
this investment of the fund, or if he did, whether these *cestuis que
truslent* are bound by such action so that they must suffer the
loss that has resulted from the investment.

Considerable testimony has been submitted to us, including
the testimony of Mr. Williams and Mr. Williams' bookkeeper.
A large part of the evidence consists of entries in Mr. Williams'
books of account. Mr. Williams, who is now a man advanced in
years has, as it appears, throughout his lifetime, been a man of
extensive business interests and an active business career; also
a successful man of business and a man who seems to have been
in the main very prudent in his investments and very exact in
his accounts.

His records of his transactions pertaining to this trust as found
in his account books and letters and papers show that when
the change was made in the investment from the stock of the
Toledo Bridge Company to the bonds of the city of Toledo, he
set down a very full and exact statement of the whole transaction
so that anyone coming into possession of his books could easily
follow the fund and see exactly how it had been invested, and
in that account and statement he even gave the numbers of the
bonds, and in other respects his accounts are very full and very
exact. But when it comes to the alleged transaction of 1882, when
these bonds of the city of Toledo were redeemed and when it
is said that the proceeds were reinvested in the bonds of the
Norwalk Gas Light Company, we find very slight, if any, evidence
in the books and papers of Mr. Williams, of such a transaction—
I mean the transaction of reinvestment. Were it not for the oral
testimony of Mr. Williams we think it would be utterly impos-
sible for anyone to determine that such a transaction had taken
place; and while in the books and papers there are some things
that are consistent with, and perhaps point to such a transac-
tion, there are, on the other hand, many things that point to
the absence of such a transaction; indeed, the only statement
found in the books that we regard as indicating with any degree

of definiteness that there was such a transaction in fact, or in contemplation, is found in the entry in the books of Mr. Williams occurring in July of 1892, after the bonds had become practically worthless. He there makes a notation to the effect that certain charges against his sister were on account of interest advanced upon this, which he continued to call the "bridge fund," and that he thus continued at that date his advancement by reason of the fact that the interest upon the Norwalk Gas. Light Company bonds had not been paid.

The oral evidence of Mr. Williams and his bookkeeper indicate that Mr. Williams regarded the money received from the Toledo bridge bonds as having been invested in the Norwalk Gas Light Company bonds and that he used the interest collected from the Norwalk Gas Light Company bonds to discharge the annual interest which he charged to himself on account of the money received from the Toledo bridge bonds.

I have indicated and perhaps should state more definitely that after the stock of the bridge company had gone into the Toledo bridge bonds, the entries in the ledger of Mr. Williams were changed and the fund denominated the "bridge fund." It continued under that designation without any interruption in form of the statement of the account, without the striking of any balance or anything to indicate any change even after the bonds had been redeemed and down to the time that he ceased to pay interest. His books indicate that he was paying 6 per cent. interest upon the $7,333.33; he was paying it semi-annually.

The interest upon the "bridge bonds" fell due upon the tenth day of May and the tenth day of November of each year. The interest upon the Norwalk Gas Light Company bonds which was equal in amount fell due upon the first day of March and the first day of September of each year.

In most of the entries following this alleged transaction of reinvestment in the Norwalk Gas Light Company bonds, the charge of the interest as having been paid to Mrs. Julia B. Jackson appears under date of the tenth day of May and the tenth day of November, though in some few instances it appears upon other dates, and in some instances upon the first of March and the first of September.

The transaction which Mr. Williams testifies was on behalf of this trust fund, was the purchase of $8,000 par value of the Norwalk Gas Light Company bonds in May of 1882; whereas the Toledo Bridge Company bonds were not redeemed until November 10, 1882. Mr. Williams, when he is first called upon to relate the facts of that transaction, seems to have remembered that he received the money from the bonds of the city of Toledo before he reinvested it in the bonds of the Norwalk Gas Light Company. He says that as soon after he made this collection as he could find the security in which to make the reinvestment, he made such reinvestment; whereas, it turns out, as a matter of fact, that this $8,000 block of bonds had been purchased by Mr. Williams some six months before the bonds of the city of Toledo had been redeemed, and upon his attention being drawn to that, he states that he had bought the Norwalk Gas Light Company bonds in anticipation of the redemption of the Toledo bridge bonds, which would seem to be a matter of loan or accommodation. But, as I have said, Mr. Williams' claim is, that he invested the money received from the city of Toledo on account of the so-called "bridge fund," or $7,333.33 in the bonds of the Norwalk Gas Light Company of equal amount, or, in other words, of the par value of $7,333.33; whereas, it further appears from his testimony that the block of bonds of $8,000 cost him but eighty-four cents upon the dollar.

Manifestly, the trustee could not be permitted to derive a profit from the purchase of bonds on behalf of the trust. It turns out that if he had purchased but $7,333.33 of par value of these bonds, he had, under the law applicable to such transactions, as between the trustee and the *cestui que trust*, invested but $6,149 of this money, leaving in his bonds, uninvested, $1,184; or, if he had invested the full $7,333.33 in these bonds at eighty-four cents, he would have purchased about $8,700 of bonds, which was more than the amount of the purchase made upon that occasion and in that transaction.

The view that Mr. Williams takes of the transaction, and the view most consistent with his testimony and his books is, that he invested but $6,149 of the trust fund in these bonds, if anything.

As I have said, the testimony tends to show that Mrs. Jackson, the mother of these parties, acquiesced in the claim or statement of Mr. Williams that he had made this reinvestment of the fund, and settled with him upon that basis; but it will be observed that these parties do not claim through, or under their mother; their rights, like that of Mr. Williams under the will, are derived directly from the testator, so that their rights are not in any way affected by any admissions or declarations or settlements or transactions upon the part of their mother; and whatever she may have said or done, can not be regarded as admissions or as evidence of any character affecting their rights.

I can not go further into the details of this transaction. I have not recited all of the pertnent evidence; I have only given a general statement of the matter; and after looking over the books and papers of Mr. Williams, without taking into account his oral statements, we find, as I have already stated, that it is impossible to determine that any such investment as now claimed was ever made in the bonds of the Norwalk Gas Light Company; that the whole claim of re-investment so far as the evidence is concerned, rests upon the oral statements of Mr. Williams, and those of his bookkeeper.

Besides this block of $8,000 of bonds, he had, as I believe I have stated, other bonds, amounting in the aggregate to $25,000. There appears to have been no attempted separation made of any part or of any number of these bonds which were set apart as the investment made on behalf of the fund. Had Mr. Williams been so disposed—we do not mean to intimate at all that he was a man that would have done or contemplated such a thing— but had he been a man of such character that he would have been disposed to treat these bonds as his own, he might well have done so, and his books and papers would have afforded no evidence against him.

So far as any record evidence is concerned—any written evidence, any evidence of a permanent form, or any evidence of the setting aside and designating of these papers as belonging to the fund—there is such an absence of anything of that kind that Mr. Williams was in a position, if the bonds became of little

value, or of no value, to say they were a part of the investment of the trust fund; or, if they became very valuable, if they commanded a premium so that it would be profitable for him to do so, it was in his power to say, ''This is my personal property, and the trust fund—the 'bridge fund'—is intact in money in my hands on account of which I have charged and paid interest rate of 6 per cent.—3 per cent. semi-annually since it came into my hands.''

Now, we think the authorities are very clear that a trustee can not thus operate with a trust fund. We have no disposition to intimate that Mr. Williams ever contemplated anything other than to regard the $7,333.33 of these bonds, as set apart as the trust property; and yet, by failing to distinctly mark or distinguish any of the bonds as trust property, either by assignment or transfer of title, or by any mark or method, or by his accounts, leaving himself in a position where he might with equal consistency, treat the bonds as his own personal property, or as trust property, we think that under the authorities Mr, Williams placed himself in a position where these *cestuis que trustent* may elect to regard that investment as having been made or as not having been made. Naturally under the circumstances, if considering their profit only, they would elect to regard it as not having been made, and this they have done. Equity will not tolerate a system of dealing that places the *cestui que trust* so much at the mercy of the trustee, and gives the trustee such an advantage as would be given here were we to uphold this transaction as claimed by Mr. Williams.

We conclude, therefore, that the prayer of the plaintiff's petition and the cross-petition of the defendants, these children of Julia B. Jackson, should be, and it is granted.

*C. L. Kennan* and *C. P. & L. W. Wickham*, for plaintiff.

*S. M. Young, C. L. Kennan, C. P. & L. W. Wickham* and *A. V. Andrews*, for defendants.